UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ADAM Z. LONG,<br><br>Plaintiff,<br><br>vs.<br><br>SMITHFIELD PACKAGED MEATS CORP.,<br><br>Defendant/Third-Party Plaintiff<br><br>vs.<br><br>ZEE COMPANY, INC., and L&B TRANSPORT, L.L.C.<br><br>Third-Party Defendants | 4:22-CV-04024-RAL<br><br><br>OPINION AND ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT |

Plaintiff Adam Z. Long, a driver for United Parcel Service ("UPS"), alleges that he was injured when he was delivering packages to defendant/third-party plaintiff Smithfield Packaged Meats Corp. ("Smithfield") and came into contact with a caustic cleaning product known as Liquid Smokehouse Cleaner ("LSC"). Doc. 1. Long sought compensatory damages and, in June 2023, moved to amend the Complaint to allege grounds for punitive damages; this Court granted the motion to amend. See Doc. 33 (motion to amend); Doc. 47 (order granting motion to amend); Doc. 49 (First Amended Complaint). Smithfield filed a third-party complaint against third-party defendants Zee Company, Inc. ("Zee"), and L&B Transport, L.L.C. ("L&B"), alleging a right to indemnification or contribution. Doc. 16. Zee manufactured the LSC, and L&B delivered the LSC to Smithfield. Id.

1

Smithfield now moves for partial summary judgment on Long's claim for punitive damages, Doc. 63, and L&B moves for summary judgment on Smithfield's claims for indemnity and contribution, Doc. 59.  Smithfield and Zee oppose L&B's motion for summary judgment. Docs. 70, 74.

## I.     Undisputed Material Facts and Facts Viewed in Favor of Nonmoving Parties

Smithfield has a pork processing plant in Sioux Falls, South Dakota.  Doc. 63 at 2.  As part of its operations, Smithfield stores and uses the chemical LSC, a "caustic soda" of sodium hydroxide, to clean its food processing equipment.  Doc. 49 ¶ 8.  LSC is a level 3, corrosive chemical[1] that should only be handled with the use of personal protective equipment.  Doc. 49 ¶¶ 9, 19.  Smithfield stores its LSC in a 3,500-gallon tank in a white concrete building known as Building 127.  Doc. 49 ¶¶ 11, 16.  Building 127 has labels on the exterior of its door, including the NFPA 704 hazard diamond; a sign that says, "WARNING CAUSTIC SODA"; and a sign that says, "AUTHORIZED PERSONNEL ONLY."  Doc. 34-10; Doc. 34-30 at 16–17.  Inside the building is a caution sign that warns of caustic soda and instructs to "avoid skin or eye contact," "avoid inhalation or ingestion," "wear protective clothing," and to wash skin or eyes "with water for 15 minutes" after any contact with the chemical.  Doc. 34-9.  The door to Building 127 remains locked throughout the day, and only certain managers and security have keys to the building.  Doc. 67-7 at 10–11.

On the evening of October 19, 2020, Glenn Westlake, an employee of L&B, arrived at Smithfield's plant to deliver LSC to Building 127.  Doc. 61-2 at 3.  There was no manager at the

---

[1] These characteristics refer to the chemical's classification under the National Fire Protection Association hazard diamond, or NFPA 704.  LSC's health hazard category on the zero-to-four scale is a three, meaning "extreme danger."  Doc. 34-30 at 17.  The NFPA 704 also classifies the chemical as "corrosive," which is indicated by the "COR" on the diamond.  Doc. 34-30 at 17.

plant at the time, so Westlake had to wait until the next day before pumping the LSC into the tank. Doc. 61-2 at 3–4. A manager arrived in the morning and approved the delivery, and Westlake began pumping LSC into Smithfield's tank in Building 127 through an external pipe attachment. Doc. 61-2 at 5. From outside Building 127, he heard the chemical splashing onto the floor. Doc. 61-2 at 5. He immediately stopped pumping the LSC, checked inside the building, and noted that the LSC had foamed out of the tank. Doc. 61-2 at 5. Westlake had not expected the chemical to foam because nothing on the federally-required safety data sheet ("SDS") warned him that the chemical was prone to foaming or that it required low-pressure pumping to avoid foaming.[2] Doc. 61-2 at 5, 7; 29 C.F.R. § 1910.1200(g) (requiring chemical manufacturers and importers to "obtain or develop a[n SDS] for each hazardous chemical they produce or import," provide an SDS to distributors and employers with certain shipments, and include certain chemical information in the SDS).

Westlake testified that he contacted someone at the plant about the spillage, and that individual, who Westlake believes was a supervisor, told Westlake to continue pumping the LSC and that chemical overflow was a regular occurrence. Doc. 61-2 at 5. No party can identify the supervisor or employee who supposedly instructed Westlake to finish making the LSC delivery.[3]

---

[2] Westlake testified that he received and reviewed the SDS for his delivery at Smithfield. Doc. 61-2 at 4–6. However, Zee challenges this point, arguing that an affidavit from David Tolleson, the Manager – Freight Logistics of Kenco Transportation Management, LLC and the broker who organized L&B's deliveries to Smithfield, contradicts Westlake's claim that he received an SDS to review. Doc. 73 at 1–2.

[3] Costa Mpunga's deposition testimony partially corroborates Westlake's account of the events on October 19–20, 2020, by confirming that a manager did arrive and authorize Westlake to begin pumping the LSC into the tank in Building 127. Doc. 80-2 at 4. Mpunga could not identify the manager who authorized the delivery, and there is no additional testimony from anyone other than Westlake himself that he spoke to that same manager after the LSC foamed out of the tank. Doc. 80-2 at 4; see also Doc. 61-1 at 1 (Smithfield's interrogatory response explaining that "Westlake contends he communicated with an unnamed supervisor, but Defendant has not been able to locate any such person despite its good faith efforts to do so").

After receiving these assurances, Westlake finished pumping the LSC into the tank at a lower pressure to avoid additional foaming. Doc. 61-2 at 6. He did not make any report to any governmental entity regarding the overflow. Doc. 61-2 at 9.

Later that same morning, Plaintiff Adam Long arrived at the Smithfield plant to make deliveries to Building 98, Doc. 49 ¶ 5, which is separated from Building 127 by an "alley," Doc. 34-24 at 12; Doc. 65 at 3. Under Smithfield's COVID-19 policies, Long made his deliveries to Building 98 by unloading the delivery onto a pallet that sat in the alley between Buildings 98 and 127. Doc. 34-24 at 12. That morning, the pallet was leaning against the wall of Building 127, under a vent. Doc. 49 ¶ 11. LSC from Building 127 had leaked from the tank and through the building's vents, down the exterior wall, and onto the pallet. Doc. 49 ¶ 11. When Long grabbed the pallet, the LSC on it burned his hands, making them feel "cold" and "numb." Doc. 49 ¶¶ 11–12; Doc. 34-24 at 17.

Long told Smithfield employees in Building 98 about the sensation he was experiencing and a "slimy" substance on his hands. Doc. 34-24 at 17. They brought him inside and instructed him to wash his hands for approximately ten to fifteen minutes, after which they directed Long to the medical facility at the plant for further assistance. Doc. 34-24 at 17–18. Long met Tammy Tjaden at the medical facility and washed his hands again. Doc. 34-31 at 4. Tjaden contacted Ken Winter, the Director of Safety and Health at Smithfield, about the incident and explained to Long his chemical exposure. Doc. 34-30 at 6, 19; Doc. 34-31 at 4, 6.

There is various, and somewhat contradictory, deposition testimony regarding Smithfield and its employees' knowledge regarding Building 127's LSC tank, its tendency to leak LSC, and the possibility for the chemical to escape Building 127 before and on the day of Long's injuries. Compare Doc. 34-26 at 7 (Victor Hernandez explaining that he had "never seen" foam escape

4

Building 127 and was unaware that could happen); Doc. 34-27 at 10 (Ronnie Johnson stating he had "never seen [the LSC] foam up"); Doc. 34-30 at 21 (Ken Winter noting that he could not say whether foam had previously leaked out of Building 127 "from [his] own knowledge"); Doc. 66-2 at 5 (Choy Sayasavanh saying he had "only seen [the tank foam over] once"); Doc. 66-4 at 5 (Mike Johnson testifying he had never seen LSC escape Building 127 and that no one reported such a leak to him); Doc. 61-1 at 1 (Smithfield's interrogatory response explaining that "Westlake contends he communicated with an unnamed supervisor [on October 20, 2020], but Defendant has not been able to locate any such person despite its good faith efforts to do so"), with Doc. 67-2 at 1 (report from Samuel Kaschke to Mike Corbett, Mike Johnson, Choy Sayasavanh, Tony Liles, and Brian Roberts mentioning a leak, LSC "run[ning] down the . . . tank," and "a heavy buildup of dry [LSC] around the pipe connections"); Doc. 34-25 at 5, 8 (Bobby Conner explaining that he had seen foam escaping Building 127 "once in a while if [the deliverers] overfilled it," that he "would get ahold of safety, or [he] would tell [his] supervisor" when that happened, and that he "assumed" the paint and cinder block corrosion under the vent was from the chemical leaking out); Doc. 34-28 at 6 (Costa Mpunga saying that he had seen chemical or foam escape Building 127 twice, that he reported it, and that Safety Director Ken Winter and "other managers . . . came over and survey[ed] the place" of the leak); Doc. 80-2 at 4 (Mpunga noting that a manager authorized Westlake to pump the chemical but uncertain who the manager was); Doc. 67-7 at 7, 10 (Choy Sayasavanh noting he had seen "lines of stain" under the vent).

Long now sues Smithfield for premises liability and seeks, among other relief, punitive damages. Smithfield seeks indemnity under its Third-Party Complaint from Zee and L&B.

## II. Standard of Review

5

Under Federal Rule of Civil Procedure 56, a motion for partial or complete summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is 'genuine' if 'a reasonable jury could return a verdict for the nonmoving party.'" Liberty Ins. Corp. v. HNTB Corp., 87 F.4th 886, 888 (8th Cir. 2023) (per curiam) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). Rule 56(a) places the burden initially on the moving party to establish the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). Once the moving party has met that burden, the nonmoving party must establish that a material fact is genuinely disputed either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012); see also Mosley v. City of Northwoods, 415 F.3d 908, 910 (8th Cir. 2005) (stating that a nonmovant may not merely rely on allegations or denials). The court views the facts genuinely disputed in a light most favorable to the nonmoving party when ruling on a motion for summary judgment. KOKO Dev., LLC v. Phillips & Jordan, Inc., No. 23-2234, 2024 WL 2005147, at *2 (8th Cir. May 7, 2024).

## III.   Smithfield's Motion for Partial Summary Judgment

Smithfield moves for partial summary judgment on Long's claim for punitive damages. Doc. 63. South Dakota law governs the substantive issues in this diversity-of-citizenship-jurisdiction case. Bores v. Domino's Pizza, LLC, 530 F.3d 671, 674 (8th Cir. 2008) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Under South Dakota law, punitive damages are

not recoverable unless expressly authorized by statute. SDCL § 21-1-4. The statute that authorizes punitive damages in tort actions provides the following:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

SDCL § 21-3-2. This statute clearly limits its applicability to tort cases involving "oppression, fraud, or malice." See also Smizer v. Drey, 873 N.W.2d 697, 703 (S.D. 2016) (stating that "[m]alice is an essential element of a claim for punitive damages" (cleaned up and citation omitted)); Dahl v. Sittner, 474 N.W.2d 897, 900 (S.D. 1991) (same).

South Dakota law erects a procedural hurdle in SDCL § 21-1-4.1 before a claim for punitive damages can be presented to the jury. The statute provides

> In any claim alleging punitive or exemplary damages, before any discovery relating thereto may be commenced and before any such claim may be submitted to the finder of fact, the court shall find, after a hearing and based upon clear and convincing evidence, that there is a reasonable basis to believe that there has been willful, wanton or malicious conduct on the part of the party claimed against.

SDCL § 21-1-4.1. SDCL § 21-1-4.1's procedural component—a hearing requirement before allowing discovery on a punitive damage claim—does not apply in federal court as federal procedural rules govern. See Ammann v. Massey-Ferguson, Ltd., 933 F. Supp. 840, 842–43 (D.S.D. 1996). However, SDCL § 21-1-4.1 also has a substantive law component of "clear and convincing evidence" of a "reasonable basis to believe [the defendant engaged in] willful, wanton or malicious conduct," and that substantive component must be applied in this diversity case. See Espinoza v. Fowler, 4:22-CV-04068-RAL, 2023 U.S. Dist. LEXIS 163306, at *6–7 (D.S.D. Sept. 12, 2023) (citing Ammann, 933 F. Supp. at 843). Thus, this Court has previously required that for

7

a punitive damages claim to survive a motion for summary judgment, the plaintiff must satisfy the standard in SDCL § 21-1-4.1 by showing by clear and convincing evidence that a reasonable basis exists upon which a jury could find the existence of malice. See Dziadek v. Charter Oak Fire Ins. Co., 4:11-CV-04134-RAL, 2015 WL 7760193, at *11–12 (D.S.D. Dec. 1, 2015); see also Straub v. Flevares, 4:13-CV-04120-KES, 2016 WL 1452363, at *2 (D.S.D. Apr. 13, 2016); Schrant v. Flevares, No. 4:12-CV-04180-KES, 2014 WL 7240090, at *2 (D.S.D. Dec. 19, 2014); Winterboer v. Edgewood Sioux Falls Senior Living, LLC, No. 4:12-CV-04049-KES, 2014 WL 28863, at *2 (D.S.D. Jan. 2, 2014).

Malice under South Dakota law can be actual or presumed, Smizer, 873 N.W.2d at 703, and SDCL § 21-1-4.1 only requires demonstrating one, Dahl, 474 N.W.2d at 901. "The statute does not require evidence of actual malice before any punitive damages issue can be submitted to the fact finder. The statute may be satisfied by establishing presumed malice . . . or actual malice . . . ." Id.; see also Fluth v. Schoenfelder Constr., Inc., 917 N.W.2d 524, 534 (S.D. 2018).

Actual malice is "a positive state of mind, evidenced by the positive desire and intention to injure another, actuated by hatred or ill-will toward that person." Dahl, 474 N.W.2d at 900. There is no evidence here of any actual malice on the part of Smithfield.

Presumed malice, on the other hand, does not mean action motivated by hatred or ill-will, but requires that an individual acts "willfully or wantonly to the injury of another." Id. The Supreme Court of South Dakota has clarified, however, that malice is not presumed from "simply the doing of an unlawful or injurious act." Id. (citation omitted). Rather, malice is presumed from acts that are "conceived in the spirit of mischief or of criminal indifference to civil obligations." Id. (citation omitted). "There must be facts that would show that defendant intentionally did something . . . [and] it can be said that he consciously realized that his conduct would in all

8

probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to the plaintiff." Berry v. Risdall, 576 N.W.2d 1, 9 (S.D. 1998) (citation omitted); Flockhart v. Wyant, 467 N.W.2d 473, 478 (S.D. 1991). Further, presumed malice is "conduct which partakes to some appreciable extent, though not entirely, of the nature of a deliberate and intentional wrong." Berry, 576 N.W.2d at 9 (citation omitted); Flockhart, 467 N.W.2d at 478. In other words, "[t]he conduct must be more than mere mistake, inadvertence, or inattention." Gabriel v. Bauman, 847 N.W.2d 537, 543 (S.D. 2014); see also Vilhauer v. Horsemens' Sports, Inc., 598 N.W.2d 525, 529 (S.D. 1999) (emphasizing that punitive damages cannot be recovered for mere negligence).

In determining whether a corporate entity has acted with malice through the conduct of its employees, South Dakota has adopted the complicity test from the Restatement. See Dahl, 474 N.W.2d at 903 ("We believe the complicity rule to be the better approach, and adopt the rule of the Restatement as the standard as to when punitive damages may be awarded against a principal for acts of his or her agent."). The complicity rule requires the principal have some knowledge before imposing liability, and only applies liability on a principal for the actions of an agent in the following circumstances:

> (a) the principal or a managerial agent authorized the doing and the manner of the act, or
> (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or
> (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
> (d) the principal or a managerial agent of the principal ratified or approved the act.

Id. (quoting Restatement (Second) of Torts § 909 (1977)).

Therefore, on the issue of punitive damages in this case, the relevant question at this time under SDCL § 21-1-4.1 is whether the record, when disputed genuine issues of material fact are viewed in the light most favorable to Long, provides clear and convincing evidence of a reasonable

basis that a Smithfield agent under the Dahl complicity test acted with presumed malice. See generally Doc. 65; Doc. 78; Doc. 81. The analysis first requires determining whether, or how much, notice and knowledge Smithfield employees had about LSC leaks from its tank and from Building 127 to assess if anyone acted with presumed malice. The second issue requires determining whether any Smithfield employee possessing knowledge of the leaks "was employed in a managerial capacity and was acting in the scope of employment" to create possible punitive damage exposure for Smithfield. See Dahl, 474 N.W.2d at 903 (quoting Restatement (Second) of Torts § 909 (1977)).

Smithfield takes the position that its supervisors had, at most, limited knowledge of LSC leaking from the tank and no knowledge of LSC leaking out of the building; this position has some support in the record. See Doc. 34-26 at 7 (Victor Hernandez explaining that he had "never seen" foam escape Building 127 and that he was not aware of the potential for foam to escape through the vent); Doc. 34-27 at 10 (Ronnie Johnson stating he had "never seen [the LSC in Building 127] foam up"); Doc. 34-30 at 21 (Ken Winter noting that he could not say whether foam had previously leaked out of Building 127 "from [his] own knowledge"); Doc. 66-2 at 5 (Choy Sayasavanh saying he had "only seen [the tank foam over] once"); Doc. 66-4 at 5 (Mike Johnson testifying he had never seen LSC escape Building 127 and that no one reported such a leak to him). If Smithfield lacked this knowledge, the failure of its employees to remedy the chemical spills and prevent the harm that Long incurred does not demonstrate the intentionality required under the presumed malice standard; ignorance of the condition does not show Smithfield "consciously realized that [its] conduct would in all probability, as distinguished from possibility, produce the precise result which it did produce and would bring harm to" Long. Berry, 576 N.W.2d at 9 (citation omitted).

However, the record equally supports Long's claims that Smithfield knew that LSC both leaked from the tank and could escape Building 127. See Doc. 67-2 at 1 (report from Samuel Kaschke to Mike Corbett, Mike Johnson, Choy Sayasavanh, Tony Liles, and Brian Roberts mentioning a leak, LSC "run[ning] down the south side of the . . . tank," and "a heavy buildup of dry [LSC] around the pipe connections"); Doc. 34-25 at 5, 8 (Bobby Conner explaining that he had seen foam escaping Building 127 "once in a while if [the deliverers] overfilled it," that he "would get ahold of safety, or [he] would tell [his] supervisor" when that happened, and that he "assumed" the paint and cinder block corrosion under the vent was from chemical leaking out); Doc. 34-28 at 6 (Costa Mpunga saying that he had seen a chemical or foam escape Building 127 twice, that he reported it, and that Safety Director Ken Winter and "other managers . . . came over and survey[ed] the place" of the leak); Doc. 67-7 at 7, 10 (Choy Sayasavanh noting he had seen "lines of stain" under the vent). Based on this evidence, a reasonable jury could find that Smithfield's failure to prevent LSC from escaping Building 127 was malicious because Smithfield should know that the high risk of harm created by a class-three corrosive chemical leaking into unprotected spaces outside Building 127 "would in all probability . . . produce the precise result" of chemically burning someone outside Building 127. A genuine dispute exists regarding Smithfield's knowledge of the chemical leak, and that appears to be a material question of fact for the jury.

Smithfield urges that what appears to be contradictory evidence does not actually demonstrate a genuine dispute of material fact. Smithfield argues that "evidence purporting to show that [LSC] 'foamed' over from its 3,500-gallon holding tank on a regular basis . . . does not show that the product created any safety risks" or that Smithfield knew it escaped Building 127. Doc. 65 at 14 n.3. There certainly is a difference between knowing that LSC could escape from

11

the tank within the locked Building 127 and knowing that LSC had leaked out of Building 127 itself. Nonetheless, what Smithfield knew about the interior tank spills—compounded with the evidence of the stained walls and testimony of non-managerial employees—can provide circumstantial evidence that Smithfield also knew about LSC leaking out of Building 127.

Next, Smithfield asserts that any testimony suggesting Smithfield knew about the building leak comes from non-managerial employees whose knowledge and conduct under the Dahl complicity test cannot impose liability on Smithfield. This argument has two flaws. First, even if Bobby Conner and Costa Mpunga are non-managerial employees and cannot satisfy Dahl by their personal knowledge of chemical leaks, both testified to reporting building leaks to supervisors. Doc. 34-25 at 5, 8 (Bobby Conner stating that he "would get ahold of safety, or [he] would tell [his] supervisor" when LSC dripped out of the vent of Building 127); Doc. 34-28 at 6 (Costa Mpunga indicating that he reported seeing prior chemical leaks and that Safety Director Ken Winter and "other managers . . . came over and survey[ed] the place" of the leak). Although some of these supervisors and managers were unnamed, Mpunga specifically states that Ted Winter, who indisputably constitutes an individual meeting the Dahl complicity test for imposing liability on Smithfield, did hear about the leaks. See Dahl, 474 N.W.2d at 903 (adopting the complicity test from the Restatement); Restatement (Second) of Torts § 909 (1977) (holding a company liable for action or inaction of agents "employed in a managerial capacity and . . . acting in the scope of employment"). Second, whether Conner is a manager whose personal knowledge and inaction is enough to impose liability on Smithfield is a disputed fact that makes summary judgment inappropriate. See Doc. 34-25 at 3–4 (Conner explaining that he is a "leadman," which is "kind of a supervisor but not a supervisor," and that he "[m]ake[s] sure everybody's doing their job" and oversees other employees); see also Doc. 65 at 9–10 (arguing Conner is not a supervisor who can

satisfy the complicity test); Doc. 78 at 29–30 (identifying Conner as a supervisor who could create liability for Smithfield). By looking at Conner's role, duties, title, and other circumstances of his employment, the jury—and not this Court—must resolve the question of fact of whether Conner is a mere employee or a manager of the type satisfying the <u>Dahl</u> complicity test.

For these reasons, this Court denies Smithfield's motion for summary judgment on Long's punitive damage claim. There exists a genuine dispute of material fact on whether Smithfield had the requisite knowledge to constitute presumed malice sufficient to support a punitive damage award, which is a jury question. <u>See Liberty Ins. Corp.</u>, 87 F.4th at 888 ("A factual dispute is genuine if a reasonable jury could return a verdict for the nonmoving party." (cleaned up and citation omitted)); <u>Brown v. Sandals Resorts Int'l</u>, 284 F.3d 949, 954 (8th Cir. 2002) ("It is axiomatic that 'credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (quoting <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000))); <u>City of Bridgewater v. Morris, Inc.</u>, 594 N.W.2d 712, 715 (S.D. 1999). However, it is important to note that these factual disputes put this Court in a somewhat awkward position. Summary judgment is plainly inappropriate where there are genuine disputes of material fact, <u>see</u> Fed. R. Civ. P. 56(a), and the court's province is not to resolve questions of fact, <u>Janis v. Nash Finch Co.</u>, 780 N.W.2d 497, 505 (S.D. 2010) ("The question of whether [a landowner] met its duty to use reasonable care is a question of fact for a properly instructed jury." (cleaned up and citation omitted)). After all, on summary judgment, a court must view the material facts subject to genuine dispute in the light most favorable to the nonmovant.

Yet SDCL § 21-1-4.1 requires "clear and convincing evidence" of a "reasonable basis to believe that there has been willful, wanton or malicious conduct" before allowing a punitive

damages claim to be submitted to a jury at trial. SDCL § 21-1-4.1 does not direct a court in making that assessment to view the facts in a light most favorable to either party. Thus, nothing in this opinion and order should be taken as guaranteeing that a punitive damages claim actually gets submitted to the jury. That decision will not be made until this Court hears all the evidence and can apply the substantive standard contained in the otherwise procedural statute SDCL § 21-1-4.1. See Vreugdenhil v. First Bank of South Dakota, N.A., 467 N.W.2d 756, 759–60 (S.D. 1991) (allowing the court to assess credibility before submitting a punitive damage issue to the jury and explaining "[t]he trial court found the plaintiffs did not establish by clear and convincing evidence that there was a reasonable basis to believe the actions of [defendant] constituted willful, wanton or malicious conduct. Where, as here, evidence was submitted through witness testimony, the trial court is in a unique position to assess the credibility of the witness" (footnote omitted)); see also Dziadek, 4:11-cv-04134-RAL, 2015 WL 7760193, at *12 (allowing a punitive damages claim to survive summary judgment but reserving for trial the issue of submitting the claim to the jury).

Therefore, Smithfield's Motion for Partial Summary Judgment, Doc. 63, is denied and this Court reserves until trial the decision whether to submit the punitive damages claim to the jury.

## IV.    L&B's Motion for Summary Judgment

Smithfield claims that it was L&B's negligence—and not its own—that caused Long's harm, making L&B liable for any judgment entered in favor of Long. Doc. 16. Specifically, Smithfield argues under theories of respondeat superior, negligent supervision, and negligent training that L&B is liable for any harm to Long because its employee Glenn Westlake (1) negligently pumped the LSC at too high of a pressure, causing the chemical to foam and overflow the tank, and (2) failed to initiate proper remedial or mitigation efforts after causing LSC to spill outside of the tank. Doc. 16; Doc. 74 at 7–11. L&B moved for summary judgment on Smithfield's

14

claims for indemnification and contribution against it, arguing that it had no duty to Long and that no reasonable jury could find Westlake's conduct negligent. Doc. 59; Doc. 62. Smithfield opposes the motion by asserting that there are genuine disputes as to material facts. Doc. 74 at 1, 9. Zee also opposes the motion, claiming that there is a material question of fact on whether Westlake received and reviewed the SDS for LSC, which bears on the issue of breach of duty.[4] Doc. 70 at 2–3.

South Dakota law governs the substantive issues in this diversity-of-citizenship-jurisdiction case. Bores, 530 F.3d at 674 (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). South Dakota recognizes both indemnification and contribution as available remedies for a tortfeasor. Avera v. St. Luke's Hosp. v. Karamali, 848 F. Supp. 2d 1017, 1020–21 (D.S.D. 2012) (citing SDCL § 15-8-12; SDCL § 56-3; Ebert v. Fort Pierre Moose Lodge No. 1813, 312 N.W.2d 119, 122–23 (S.D. 1981)). "A right to contribution arises when a party to a joint, or joint and several, obligation satisfies more than his share of the claim against all. In contrast, indemnity is an 'all-or-nothing' proposition where the party seeking indemnification must show an absence of proportionate fault to shift the entire liability." Jorgensen Farms, Inc. v. Country Pride Coop., Inc., 824 N.W.2d 410, 414 n.2 (S.D. 2012) (cleaned up and citation omitted). Therefore, to be entitled to either contribution or indemnification if Smithfield were found liable to Long, Smithfield must show L&B acted negligently and that L&B's negligence caused or contributed to Long's harm.

---

[4] L&B has not moved for summary judgment on the crossclaims between it and Zee for indemnity and contribution; however, resolving the issue of L&B's negligence for purposes of Smithfield's claims for indemnity and contribution could essentially determine the outcome of those crossclaims. If this Court were to grant summary judgment in favor of L&B on Smithfield's claims, it would have to determine L&B was not negligent as a matter of law. As a result, Zee's claims against L&B for indemnification and contribution would similarly fail.

An employer can be vicariously liable for the negligent actions of its employee under the theory of respondeat superior when the employee is acting in the course and scope of employment, Iverson v. NPC Int'l, Inc., 801 N.W.2d 275, 278–79 (S.D. 2011), or can be directly liable for acting negligently in supervising or training an employee who acts negligently, Kirlin v. Halverson, 758 N.W.2d 436, 448 (S.D. 2008) ("Generally, the law imposes no duty to prevent the misconduct of a third person. However, an employer may be held liable for negligent hiring, retention, training and supervision." (cleaned up and citations omitted)). In either circumstance, the plaintiff must show the employee acted negligently or in an otherwise tortious manner.

To show negligence, a plaintiff must demonstrate the defendant had a duty, that the defendant breached that duty, and that the breach caused harm to the plaintiff. Hanson v. Big Stone Therapies, Inc., 916 N.W.2d 151, 158 (S.D. 2018) ("In order to prevail in a suit based on negligence, a plaintiff must prove duty, breach of that duty, proximate and factual causation, and actual injury." (citations omitted)). Whether the defendant had a duty is a question of law for the court. Janis, 780 N.W.2d at 500. Whether the defendant breached that duty and, in so doing, caused harm to the plaintiff are questions of fact typically reserved for the jury. Stone v. Von Eye Farms, 741 N.W.2d 767, 770 (S.D. 2007) ("This Court has repeatedly stated that questions of negligence, contributory negligence and assumption of the risk are for the jury in all but the rarest of cases so long as there is evidence to support the issues." (citation omitted)). In fact, "only when reasonable men can draw but one conclusion from facts and inferences" on issues of negligence do "they become a matter of law" proper for the court to decide on summary judgment. Stone, 741 N.W.2d at 770 (citation omitted).

**A. Duty**

16

South Dakota law imposes a duty to protect others from harm "depend[ing] on the relationship of the parties and public policy considerations." Johnson v. Hayman & Assocs., 867 N.W.2d 698, 702 (S.D. 2015) (internal citations omitted). The duty a landowner owes to an entrant on the property depends on whether that entrant is a trespasser, licensee, or invitee, which includes a business invitee "who is invited to enter or remain on land for a purpose directly or indirectly connected with business dealings with the possessor of land." Janis, 780 N.W.2d at 501 (cleaned up and citation omitted). "As a general rule, the possessor of land owes an invitee or business visitor the duty of exercising reasonable or ordinary care for the benefit of the invitee's safety, and the possessor is liable for the breach of such duty." Id. (cleaned up and citation omitted).

In some circumstances, this duty can extend to an independent contractor on the premises when that party "steps into the shoes of [the primary land possessor] and is entitled to [the primary land possessor's] liabilities and immunities." Ebaugh v. PetSmart, Inc., Civ. No. 10-4153, 2012 U.S. Dist. LEXIS 91993, at *16 (D.S.D. July 3, 2012). Under the Restatement (Second) of Torts, this extension of liability and immunity arises under the following circumstances:

> One who on behalf of the possessor of land erects a structure or creates any other condition on the land is subject to the same liability, and enjoys the same freedom from liability, as though he were the possessor of the land, for physical harm caused to others upon and outside the land by the dangerous character of the structure of other condition while the work is in his charge.

Restatement (Second) of Torts § 384. The Supreme Court of South Dakota has not considered the adoption of § 384, but this Court predicts that it would do so. See Ebaugh, 2012 U.S. Dist. LEXIS 91993, at *16 (explaining that, like a prior case, "[t]he court will also assume here that the South Dakota Supreme Court would adopt § 384"); Smithey v. Stueve Constr. Co., Civ. No. 04-4067, 2007 U.S. Dist. LEXIS 3871 (D.S.D. Jan. 18, 2007) (determining South Dakota would likely follow the majority of jurisdictions in applying § 384).

17

Here, Long was a business invitee of Smithfield because he was at the plant to deliver shipments of various products Smithfield ordered for its business operations, thereby "connect[ing him] with business dealings with the possessor of the land." Janis, 780 N.W.2d at 501 (citation omitted). Smithfield thus owed Long a duty to exercise reasonable or ordinary care. That duty extended to L&B because L&B, while working on behalf of Smithfield to fill the LSC tank, arguably created a dangerous land condition when Westlake pumped the LSC into the tank in Building 127 in a manner causing it to foam into the alley outside Building 127. See Restatement (Second) of Torts § 384.

L&B also had a duty to Long based on foreseeability of injury to another from mishandling the delivery of a dangerously corrosive product like LSC. In cases where the parties do not have a relationship imposing a duty, "foreseeability may also create a duty. Although foreseeability is a question of fact in some contexts, foreseeability in defining the boundaries of a duty is always a question of law." Johnson, 867 N.W.2d at 702 (cleaned up and citations omitted). L&B had a duty to properly deliver and unload LSC at Smithfield in a way that avoided injury to Smithfield's business invitees and others who might be or come into the area of Building 127. Overfilling the tank in Building 127 to the point where the dangerously corrosive LSC leaked out of the vent and into the alley area foreseeably could injure business invitees of Smithfield unaware of LSC's dangerous properties. Therefore, L&B owed a duty of reasonable care to Long as a business invitee and as a foreseeable plaintiff, and L&B's breach of that duty could support Smithfield's claims for indemnity or contribution from L&B.

**B. Breach**

The parties dispute whether Westlake breached his duty of reasonable care by filling the LSC tank too quickly and failing to take remedial measures after realizing the tank was foaming

18

over. This dispute involves genuine issues of material facts, making entry of summary judgment

inappropriate. See Fed. R. Civ. P. 56(a) (only allowing summary judgment where "there is no

genuine dispute as to any material fact"); Fed. R. Civ. P. 56(c)(1)(a) (indicating that a "party

asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to

particular parts of materials in the record, including depositions, documents, electronically stored

information, affidavits . . . , admissions, interrogatory answers, or other materials"); Iverson, 801

N.W.2d at 279 (stating that breach is a "factual question[] that must be determined by the trier of

fact").

      L&B first argues that Smithfield had the responsibility for instructing Westlake to deliver

the LSC at an idle speed because the overflow system on the tank was not working properly, and

Smithfield's failure to instruct him means no reasonable jury could find Westlake's conduct

breached his duty of reasonable care. Doc. 62 at 7; see also Doc. 61-2 at 5 (Westlake indicating

that Smithfield did not give him any instructions about the speed or pressure to use when pumping

the LSC into the tank); Doc. 61-7 at 3 (Ken Winter confirming that LSC foamed out of the tank

because the lid would not close completely). L&B further asserts that Westlake reviewed the SDS

and acted reasonably in pumping the LSC at a higher speed and pressure because the SDS did not

alert Westlake to the possibility of the chemical foaming.[5]  Doc. 61-2 at 5, 7; Doc. 62 at 8.

---

[5] Zee disputes whether Westlake did, in fact, review the SDS for LSC. David Tolleson, the Manager – Freight Logistics of Kenco Transportation Management, LLC ("Kenco") and the broker who organized L&B's deliveries to Smithfield, signed an affidavit describing Kenco's practices of providing SDS to drivers. Doc. 73 at 1–2. Tolleson stated that Kenco provides the SDS when requested, that he did not provide Westlake with an SDS because Westlake never requested one, and that most drivers have enough experience pumping chemicals like LSC that they do not ask to review the SDS. Doc. 73 at 1–2 (stating that he "do[es] not provide . . . material data sheets (SDS), unless the carrier or driver requests them," that providing an SDS is "unusual" because the drivers are experienced, and that he "do[es] not recall a driver for L&B Transport, LLC ever requesting the [SDS] from" him). Through this affidavit, Zee attempts to suggest Westlake never did read the SDS. However, nothing in the affidavit indicates that that only Kenco—and not Zee—would

Smithfield counters that L&B should have informed Westlake about LSC's foaming potential and about the plant's tank overflowing during a prior delivery as part of its responsibility for supervising and training him. Doc. 74 at 2, 10–11. Of course, it is L&B's alleged negligence— and not Smithfield's—that matters in ruling on this motion for summary judgment. A reasonable jury could find that L&B's failure to instruct Westlake about the precautions and care when delivering and offloading LSC at Smithfield's plant constituted a breach of its duty to supervise and train Westlake. Further, a reasonable jury could determine that Westlake was negligent in pumping the LSC at a non-idle speed or continuing to unload LSC at a lower rate despite knowing the tank had foamed over. Viewing the genuinely disputed material facts in the light most favorable to Smithfield, the issue of L&B's alleged breach of duty is a question of fact which must go to the jury. A reasonable jury could find that L&B, directly or vicariously through its employee Westlake, breached the duty of reasonable care to properly and safely deliver the LSC to Smithfield's plant.

Smithfield also argues that there are questions of fact related to whether Westlake's post-spill conduct constituted a breach of duty. First, Smithfield relies on Westlake's failure to report the spill to any government authority to claim that Westlake's conduct breached the duty of care; had he reported the spill, Smithfield contends, someone would have taken remedial measures that would have prevented Long's injury. Doc. 74 at 9; see also Doc. 34-32 at 12 (Westlake testifying that he did not report the spill to CHEMTREC or any governmental authority but that he did "report[] it to [his] immediate supervisor"). Second, Smithfield asserts that a jury, and not the court, is responsible for making credibility determinations regarding Westlake's testimony that he

_____

have provided the SDS. Doc. 70 at 1–2; see also Doc. 72-1 at 5 (Westlake claiming that giving drivers the SDS "was the responsibility of the shipper who also manufactured that product," which would be Zee). Regardless, this appears to be a fact issue for trial.

spoke to a Smithfield supervisor about the LSC spill because, according to its interrogatory request, Smithfield "has not been able to locate any such person despite its good faith efforts to do so." Doc. 61-1 at 1. Other employees working that day are also unable to identify the supervisor who presumably was on shift. See Doc. 34-28 at 8 (Costa Mpunga stating he cannot remember which manager was on shift that day). L&B counters that Westlake did not need to report the spill to outside entities because of the size of the spill and the response from the Smithfield supervisor with whom he spoke. Doc. 79 at 4; Doc. 34-32 at 12. L&B argues that there is no competent record evidence to directly contradict Westlake's testimony and highlights that Smithfield's own employee partially corroborated Westlake's story when he testified that a manager was present and approved the delivery before Westlake began pumping the LSC. Doc. 79 at 4–7.

L&B also asserts that Smithfield has not produced any expert testimony to suggest that it breached its standard of care in supervising and training Westlake by failing to tell Westlake about the chemical's foaming potential and the prior delivery spill at the Smithfield plant. Doc. 79 at 4. Expert testimony is generally necessary to show breach in cases of professional negligence, but it is not required if "the area is within the common knowledge and comprehension of the ordinary laymen. Unless the issues are unusually complex, expert testimony is not required." Mid-W. Elec. v. DeWild Grant Reckert & Assocs. Co., 500 N.W.2d 250, 255 (S.D. 1993) (citation omitted); see also Jaeger v. Henningson, Durham & Richardson, Inc., 714 F.2d 773, 775–76 (8th Cir. 1983) (not requiring expert testimony under South Dakota law when nothing in facts was so highly technical to be outside the experience or understanding of laymen). Although Westlake's conduct in delivering the chemicals could be the subject of expert testimony, ordinary laymen without expert assistance likely can grasp a dispute over an employer's alleged failure to train and supervise an employee of known risks related to delivering a hazardous chemical. Therefore, a reasonable jury

does not need expert testimony to decide whether L&B breached its duty of care by not informing its driver, who transports and delivers dangerous chemicals, about the chemical's properties and specific delivery instructions, including not filling a tank in a manner to have the caustic substance flow out into an alley.

There exists a question of fact on whether Westlake breached his duty of reasonable care by failing to further report the spill, as required by L&B's policies, to CHEMTREC or a government agency. See Doc. 34-32 at 41. Moreover, viewing Westlake's testimony, the existing deposition testimony of the various Smithfield employees who were at the plant on the day of the incident, and Smithfield's interrogatory response related to making every effort to uncover the supervisor in the light most favorable to Smithfield, there are questions of fact related to what information Westlake reported about the spill, to whom he reported that information, whether that person was a supervisor sufficient to create liability for Smithfield, and whether these actions met his duty of care. Resolving the question of whether Westlake's post-spill conduct constituted a breach of the duty of care belongs in the hands of the jury, making summary judgment inappropriate. See Iverson, 801 N.W.2d at 279 (stating that breach is a "factual question[] that must be determined by the trier of fact"); Fed. R. Civ. P. 56.

For these reasons, this Court cannot conclude as a matter of law that Westlake and, in turn, L&B, acted reasonably and did not breach the duty of care. Therefore, genuine issues of material fact on Smithfield's third-party complaint render summary judgment for L&B inappropriate.

## V.    Conclusion

For the reasons explained, it is

ORDERED that Smithfield's Motion for Partial Summary Judgment, Doc. 63, is denied. It is further

ORDERED that L&B's Motion for Summary Judgment, Doc. 59, is denied.

DATED this 3ʳᵈ day of June, 2024.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE

23